MILTON A. KENT *vs.* WILLIAM N. TODD & another.

Suffolk.   March 4. — May 10, 1887.   FIELD, C. ALLEN, & GARDNER, JJ., absent.

The owner of a building leased to A. the first floor of the building, with a right to use a hoistway in common with the other occupants of the building. This hoistway ran from the top to the bottom of the building, and was enclosed, but communicated with each story by a door. The hoistway on each story had two trap doors, which, when down, made a continuous floor with that of the rest of the story. The owner of the building subsequently leased to B. "all the chambers in the building over the store on the street floor," with a right to use the hoistway in common with the occupant of the store below. *Held,* that B. had,

under his lease, a right to the use of the trap doors on the floors leased to him, for the purpose of storage, when not required by A. for hoisting purposes. *Held, also,* that if the tenants made an agreement by which any person after using the hoistway should shut the trap doors, B. had a right to expect *that A.,* after using the hoistway, would shut the trap doors, although B. subsequently went to the hoistway to get something he had stored there.

TORT, for personal injuries sustained, through the alleged negligence of the defendants in leaving open and unguarded a hoistway in a building in Boston, at the corner of Franklin Street and Arch Street.

Trial in the Superior Court, before *Dewey,* J., who allowed a bill of exceptions, in substance as follows:

There was in the rear of the building in which the accident happened, and at the corner nearest to Franklin Street, a hoistway running from the basement to the top story. It was partitioned off from the various rooms through which it passed, but could be communicated with from each floor by means of doors opening from the hoistway into the several rooms, which when closed were secured by bolts slipping into sockets attached to the wood-work of these partitions. Upon opening one of these doors, the interior of the hoistway was exposed. When not in use, the hoistway upon each floor could also be closed by two trap doors, which met together in the middle of the hoistway on a line perpendicular to the entrance to the hoistway, but, when the hoistway was in use, the trap doors could not be closed. Between the threshold of the entrance door to the hoistway and the trap doors was a planked space of one and a half feet. In the roof at the top of the hoistway there was a drum over which revolved a rope and chain of sufficient length to be lowered, when required, to the basement; there was also on each floor, connected with the entrance to the hoistway, a movable pole or bar with sockets fitted thereto, which bar could be put in position as a guard or barrier; but, when the trap doors were shut, there was no occasion for the bar, and it was then sometimes in position, and sometimes left in the hoistway, and sometimes left standing in or near the hoistway, according as the parties had occasion to go upon the trap doors or not. Sometimes when the trap doors were open, the bar was also out of position. When the trap doors were down, they were upon a level with their respective floors; and when the

entrance doors to the hoistway were open, they were capable of being used in connection with the rest of the story.

The defendants had a lease from the owner of the building, dated March 1, 1880, of " the first floor and basement beneath " in the building, which lease contained this clause: " The hoistway is to be enjoyed and used in common with all the other tenants in the building."

The plaintiff had a lease from the owner of " all the chambers " in the building, " over the store on the street floor; . . . . to have and to hold the said chambers, premises, hereby leased," etc. The lease also gave him " the use of the hoistway, in common with the owner or occupants of the store and floors below." The lease also contained this clause: " And the lessee further promises that he will keep whole and in good condition all the window and other glass on the premises." The plaintiff occupied only the second story of the building, having sublet the third and fourth stories.

It appeared that, in fact, for many years, the plaintiff had used the trap doors, when in position, for the purpose of unloading boxes of merchandise, and that skins had been beaten there; that inside the hoistway, and opposite to the entrance of it, there was upon the plaintiff's story a window which could only be reached by passing over the trap doors when in position; and that this window was in summer time frequently raised as a means of ventilation for the entire floor, and the plaintiff also was, and for a long time had been, in the habit of beating and shaking mats from this window. It did not appear that any of these uses to which the plaintiff thus put the hoistway and the trap doors when in position were ever objected to, or known by, the owner of the building.

The method of operating the hoistway was as follows: If the defendants desired to transfer merchandise from the street through the hoistway to their basement, which was several feet below the level of the street, their boy would first open a door, the bottom part of which was on a level with the street, and extended above the level of their trap doors, and led from the hoistway to the street; and would then lift up the trap doors, which were on a level with their store floor, would then go up the stairs to the top of the building, stopping at each floor as he

went up, and, if found closed, opening the left-hand trap door on each floor, leaving the right-hand trap door still in position. Arriving at the top, he would unroll the chain and rope from the drum, and lower it to the defendants' floor, whence it would be taken into the street and attached to the merchandise there standing, which would then be hoisted and lowered into the defendants' basement. During this operation both the trap doors would remain open upon the defendants' floor, but only one (the left-hand trap door) would be opened upon the second and upper floors.

The defendants' boy testified, that, if he found the bar in position, he left it there, and if it was not in position he did not touch it nor even look for it; that he knew that it was dangerous to leave the trap door up without such bar, and knew that the bar was there, and knew for what it was intended; but nevertheless had never, either on the day of the accident or before, taken down or put up such bar when opening the trap door upon the plaintiff's or any of the upper floors. The defendant Todd also testified, that he knew it was dangerous to leave the trap door up, but that he never instructed his boy to put up the bar when leaving the trap door up, either on the day of the accident or at any other time, and never gave him any instructions about the bar.

The defendants' boy also testified that he was thus in the habit of opening trap doors on the floor of the plaintiff's story and upper stories at all times of the day, without giving any notice to the plaintiff or other occupants of such floor other than such as was given by going through the premises for the purpose, and it appeared that in fact on the day of the accident, just before the accident happened, he had thus opened the trap door on the plaintiff's floor, without giving any other notice than such passage through his floor, to the plaintiff.

As bearing upon this use of the hoistway, there was evidence tending to show that, in 1881, one Goss, the superintendent of the occupant of the upper floor, made an agreement with the plaintiff and the defendants that each of the tenants of the building who used the hoistway, rope, and chain should hoist the same, after using them, to the drum, and that each occupant should take care of and shut his own trap doors at night, if the

trap doors had not previously been shut, and that no tenant should have any responsibility for the closing of trap doors on any floor but his own; that the occupants and their employees ever after acted upon this agreement, and that there was no agreement, understanding, or practice as to placing any bar across the doors on either floor. The defendants, however, testified, that, with the exception of putting up the chain, there was after the agreement no change in the method of operating the hoistway from what it was before the agreement.

All this evidence, however, was denied by the plaintiff's testimony, who offered evidence tending to show that there was in the spring of 1881 an arrangement made between him and the defendants, by which any person who had any occasion to use the hoistway at any time should himself open the trap doors, and should, when he was through with the hoistway, himself close the trap doors; and the plaintiff also offered evidence tending to show that, for a long time prior to the accident, that in fact had been the course pursued by the defendants, by himself, and by other occupants of the building; namely, that the person using the hoistway should open the trap door, put up the bar, shut and bolt the door, and, after getting through using it, the same person would pull up the chain and shut the trap door.

Some of the plaintiff's witnesses testified that the trap doors were frequently left open, and that it was the practice of the plaintiff's men to close the trap doors of the plaintiff's floor, if open, the last thing at close of work; but it was contended by the plaintiff, and there was evidence on the part of the plaintiff tending to show, that this was not in accordance with any agreement made between the parties, but was done as a matter of general precaution at night.

About noon on January 3, 1884, the plaintiff placed in the right-hand corner of the hoistway, which was cooler than the rest of the premises on that story, a basket of chickens, some of which he was intending to take home with him at night. The basket rested partly on the right-hand trap door and partly on the wood-work separating the trap door from the wall of the hoistway. Both trap doors were then down in position, and it appeared that neither the plaintiff nor the defendants, nor any one in their employ, that day used the hoistway, or opened the

trap doors, until they were opened by the defendants, before the accident.  Some time in the afternoon, about two o'clock, according to the plaintiff's testimony, and a little after half-past four, according to the defendants' testimony, the boy of the defendants, at their request, and with their authority, came up-stairs to the plaintiff's store, and, without giving any notice to any one other than his appearance and such noise as the operation of the hoistway might make, unbolted and opened the entrance door.  He testified, and this was not contradicted, that he found no bar up or inside the hoistway, and that he opened the left-hand trap door, leaving in position the right hand trap door, and went away, closing and bolting the door leading from the plaintiff's store to the hoistway; but did not put the bar in position or look for it, or make any inquiry for it.  He also testified, that, even if he had looked for it or seen it, he should not have put it in position.  The testimony of the plaintiff showed, and this was not contradicted, that the bar was always just inside or just outside the hoistway, where it could easily be seen and reached; but no one of the plaintiff's witnesses testified that on the particular day of the accident he had actually seen the bar.  The hoistway remained in the condition in which the boy left it until the accident happened.  When the boy came through the plaintiff's store to open the trap doors as above stated, the plaintiff was in the store; but the testimony left it in doubt whether the plaintiff was aware of the boy's entrance, or of what he had done.

All of the defendants' testimony tended to show that the merchandise, for the moving of which the hoistway was used, arrived at the defendants' store a little after half-past four o'clock in the afternoon; that the trap doors were then opened; that it took some time, until about five o'clock, to operate the machinery of the hoistway; and that the merchandise had been raised and lowered into the defendants' basement, and the trap doors of the defendants closed and put into position about five minutes before the accident.

The defendants' counsel, in his opening, stated that the boy, when he opened the trap door on the plaintiff's floor, saw the basket of chickens in the hoistway, but this boy was present at the trial and testified that he did not see the basket of chickens.

About five o'clock, the plaintiff put on his coat and prepared to start for his train, which left from the station of the New York and New England Railroad Company at a quarter-past five o'clock. He then went towards the hoistway, and unbolted and opened the door leading from the store to the hoistway. He testified that he looked straight before him, and that the bar was not up in the sockets, and that he then walked. into the hoistway without stopping to ascertain its condition further, as confidently as he would anywhere, and that his sole purpose was to get his chickens, and then fell through the open space occupied by the left-hand trap door when shut, to the defendants' floor, sixteen feet below, striking on his feet and back, and sustaining the injuries of which he complained.

There was evidence tending to show that the hoistway was dark at the time, and also that both of the gas lights, which were nearly in front of, and about nineteen feet from the entrance door of the hoistway, were burning, one of them quite dimly, when the plaintiff opened the entrance door of the hoistway. There was no claim on the part of the plaintiff that his rights in this case were affected by any ordinance of the city of Boston, and the plaintiff did not call the attention of the court to any statute affecting the case.

The plaintiff requested the presiding judge to instruct the jury as follows: "1. If a person for his own purposes and advantages, by removal of trap doors or otherwise, creates an excavation or hole near or adjoining the premises of another, and knows that such hole may be dangerous to the occupant of the neighboring premises, it is his duty, independently of any. agreement, whenever he makes such excavation or hole, to take such steps as are reasonable, by bars or otherwise, to protect and guard it; and if he fails to do so, and a person is, while in the exercise of due care, injured by such neglect, the latter may recover therefor. 2. The general principle of law is, that one person must so use his own property and rights as not unnecessarily to interfere with the property and safety of his neighbors. 3. If the jury find that there was an agreement between the plaintiff and the defendants to the effect that, whenever the defendants used the hoistway, they should see that the bar was put up, then, if the defendants negligently neglected such duty,

the plaintiff, if in the exercise of due care, may recover for any injury which he has received in consequence of such neglect of the defendants."

The judge refused so to instruct the jury; and, after giving them instructions on the question of due care on the part of the plaintiff, to which no exceptions were taken, continued as follows:

"It appears that the accident occurred in a certain building in this city, which you have seen, and there is no dispute between the parties that in the corner of that building there is a hoistway extending from the upper story to the basement, closed in by doors, having trap doors on the inside. In the first place, at this point, the rights of the plaintiff in that hoistway are determined by the terms of a written lease under which he holds, and the duty of the construction of that lease and the definition of his rights under it are imposed by law upon the court; and I instruct you that, if you find that hoistway to be constructed in the manner I have described, the plaintiff had no rights in it under his lease, except to use it for the purposes of the hoistway. And the lease does not entitle the plaintiff to use the hoistway for the storage of merchandise. While using it for such a purpose, he was not in the exercise of rights conferred by the lease.

"If you find the testimony given by the plaintiff himself to be correct, namely, that at the time he met with the injury he entered the hoistway designedly for the sole purpose of getting some chickens which he had stored in it during a portion of the day, then the defendants were not under any legal obligation to the plaintiff, while so using the hoistway, to keep the same in a safe and suitable condition for such use, and the plaintiff used the same at his own risk; unless the plaintiff satisfies you that the defendants put themselves under such legal obligation by virtue of some agreement or understanding made by the defendants with the plaintiff to protect the plaintiff while using the hoistway for such purpose, not contemplated in its erection. Under the lease of the defendants, and upon the undisputed evidence in the case, the defendants had the right to use the hoistway from the basement to the top story in common with the plaintiff and other tenants; and their obligation, at common law, to the plaintiff, apart from any special agreement which I

shall hereafter refer to, was an obligation to the plaintiff to use due and ordinary care in reference to the hoistway, while the plaintiff was also using it for the purposes of a hoistway. And, by the common law, if he used it for the purpose of storing chickens, and went there, intentionally or designedly, for the sole purpose of getting the chickens, while so using it, the defendants were under no legal obligation to him as to the care of the hoistway and bars. So that, if the plaintiff is entitled to recover in this case, he is entitled to recover by virtue of some understanding and agreement, which the burden is upon him to satisfy you was made and had with the defendants as to the care and use of the hoistway.

" In passing upon the question of whether there was any such agreement and understanding, — for that is the critical point in this part of the case, — you must carefully consider all the facts of the case; whether or not this hoistway was designed and adapted for the use of a hoistway only; whether or not it was liable to be used at all times during the day by different tenants as a hoistway. And if the defendants made any agreement or had any understanding with the plaintiff as to how they would manage the hoistway and take care of the same after using it, was this understanding and agreement with reference to some use of the hoistway outside of and apart from the purpose for which it was designed, or had it reference only to the use of the hoistway as a hoistway? Did they put themselves, and did the plaintiff understand that they put themselves, under obligation as to care to the plaintiff while using the hoistway for some other purpose than that of a hoistway?

" Unless the plaintiff satisfies you that the defendants did, by some understanding or agreement, put themselves under such obligation and have failed to keep it, the plaintiff is not entitled to recover. He must satisfy you that the defendants had an understanding or agreement with him, which covered the uses of this hoistway for other purposes than that of a hoistway, and that such understanding or agreement has not been kept by them.

" I ought perhaps to allude to the claim of the defendants. The defendants contend that they made a special agreement, by which, in substance, each tenant was to care for the doors upon

his own floor, and of course it would be the legal duty of the defendants, if they are to avail themselves of such an agreement as that to exonerate themselves from other liabilities, to prove the agreement. °The burden is upon the defendants to satisfy you of such an agreement, and, in that connection, I give you this instruction : If the jury believe, upon the evidence, that there was an arrangement or understanding between the plaintiff, the defendants, and Goss that whoever used the hoistway was to hoist the rope and chain to the drum after such use, and that each tenant was to see to closing the trap doors upon his own floor, and that no agreement or understanding respecting the placing of any bar across the entrance was made between the parties, the plaintiff is not entitled to recover in this action.

" If the jury shall find upon the evidence, that the bar across the door into the hoistway, upon the plaintiff's landing, was left by the plaintiff and his servants sometimes in and sometimes out of place, and that the same, upon the day of the accident, as left by the plaintiff, was not in its position across the door, and that the plaintiff, without stopping to ascertain whether or not it was in its position as a barrier across the door, entered upon the hoistway for the purpose of removing chickens therefrom, and that there was no agreement or understanding between the plaintiff and the defendants that any bar should be placed across the plaintiff's door when the defendants were using said hoistway under their lease, the plaintiff cannot recover.

" In the absence of any agreement or understanding between the parties, in relation to the placing of a bar across the plaintiff's entrance to the hoistway, the mere omission, by the defendants' servant, to place a bar across such entrance, does not of itself furnish a ground of action to the plaintiff for injuries received from the absence of said bar. But, in order to recover, the plaintiff must satisfy the jury that the defendants, by their servants, removed a bar which had been placed as a barrier across said entrance, or failed to place it in the position required by said agreement or understanding."

The jury returned a verdict for the defendants ; and the plaintiff alleged exceptions.

*W. Gaston & C. L. B. Whitney*, for the plaintiff.

*Samuel Hoar & W. P. Harding*, for the defendants.

HOLMES, J.    This is an action of tort for damage suffered by the plaintiff in consequence of falling through a hoistway.   The plaintiff was tenant of the second, and the defendants of the first, story of the building where the accident happened.   The leases of both parties gave them respectively the use of the hoistway in common with the other tenants.   The hoistway was partitioned off from the rooms through which it passed, with bolted doors opening into it on each story, and, when not in use, could be closed by two trap doors which made a floor continuous with that of the rest of the story.   There was also a bar which could be put across the entrance door when either trap door was open.

The defendants' servant, for the lawful use of the hoistway, unbolted and opened the entrance door, opened one of the trap doors, and then shut and bolted the entrance door again.   The plaintiff had previously placed a basket of chickens inside the partition, seemingly in such a way as not to interfere with the use of the hoistway, and, when about to go home, unbolted and opened the entrance door in order to get them, went in, and fell.

The court instructed the jury, in substance, that the plaintiff had no rights in the hoistway under his lease, except to use it for the purposes of a hoistway ; that by the common law, (that is, as we understand, apart from agreement,) if he used it for the purpose of storing chickens, and went there for the sole purpose of getting the chickens, while he was so using it, the defendants were under no legal obligation to him as to the care of the hoistway and bars; and that, if the plaintiff was entitled to recover, it must be by virtue of some agreement which it lay on him to prove, and also to prove that the agreement covered uses for other purposes than that of a hoistway.

The first of these instructions, we think, limits the plaintiff's rights too strictly.   We cannot construe the lease as excepting so much of the floor as covered the hoistway, so that the plaintiff was a trespasser when he walked upon it for any purpose other than using the hoistway as such.   It appears to us a more reasonable construction to hold that the plaintiff might go there for any purpose not inconsistent with the rights of the other tenants.   And this view is confirmed by the fact, that one of the windows on the plaintiff's floor, which the plaintiff seems to have

been bound to keep in repair, and which a tenant would naturally expect to open or shut at pleasure, could only be reached by crossing the hoistway.

The other rulings are based on the premise that the plaintiff was a trespasser; and this error, as we must regard it, did undoubtedly tend to prejudice the plaintiff's case, even if, on other grounds, we should reach some of the conclusions stated by the learned judge at the trial. In one branch of the case, in particular, we think it probable that the jury were misled. The plaintiff set up an agreement, or understanding, and course of dealing, which, as he contended, gave him a right to expect to find the bar in place when the trap door was open. The language of the charge was as follows : " If the defendants made any agreement or had any understanding with the plaintiff as to how they would manage the hoistway and take care of the same after using it, was this understanding and agreement with reference to some use of the hoistway outside of and apart from the purpose for which it was designed, or had it reference only to the use of the hoistway as a hoistway ? Did they put themselves, and did the plaintiff understand that they put themselves, under obligation as to care to the plaintiff while using the hoistway for some other purpose than that of a hoistway ? "

In a sense, this is all true, but coming, as it did, after a statement that the plaintiff had no right under his lease to be where he was for the purposes for which he went there, it must have been understood, and probably was intended to be understood, that a general agreement as to the way in which the defendants would use the hoistway would do the plaintiff no good, unless there was some express reference to his use of it for other purposes than those of a hoistway. We are of opinion that, if the defendants had given the plaintiff the right to expect that, when they opened the trap, they would put up the bar as well as bolt the entrance door, the plaintiff had the same right to rely on that expectation when going to the hoistway for chickens, as when going there to open the window or to prepare to receive goods.

Although the exceptions must be sustained for the reason which we have given, it seems advisable to give a little consideration to the general question, which was dealt with by the court below, and which must arise again, what, if any, were the

plaintiff's rights, in the absence of any agreement or understanding. For, even if the plaintiff was not a trespasser, it is still by no means clear whether the defendants owed him any duty, and if so, whether it was not performed.

In the case of *In re Williams* v. *Groucott*, 4 B. & S. 149, the defendants, who were entitled to the minerals under a field, had lawfully opened a mine shaft in it, but had left the shaft improperly guarded against horses. The plaintiff occupied the field, and his horse fell into the shaft, and was killed. It was held that the defendant was liable, although the question was regarded as nice and novel.

Assuming that we should have decided that case the same way, it will be seen that this is much nearer the line, so far as any duty and breach of duty to guard the hoistway are concerned. The reason given by Chief Justice Cockburn for the decision was, " that it is more reasonable to expect that the man whose act produces the danger should do all that is reasonably necessary to prevent injurious consequences to the owner of the surface soil, who does not know that a shaft will be sunk, or, if so, when or where it will be sunk." Here the plaintiff knew of the hoistway, the damage was done to his own person, and while in the English case the defendant had possession of the shaft, here the plaintiff was in possession of the locus. These facts add to the strength of the position for the defendants stated by Chief Justice Cockburn, that they did no more than they had a right to do, and, if dangerous consequences were likely to arise to the plaintiff, it was for him to guard against them.

However this may be, apart from agreement or understanding, what duty to guard the hoistway could there have been which the defendants did not perform? It cannot be argued that, on general principles, the defendants were bound to put up two guards, one behind the other. If a man cannot complain when he knowingly walks through a door which he knows leads to a hole that may or may not be covered over, (*Taylor* v. *Carew Manuf. Co.* 140 Mass. 150, and 143 Mass. 470,) he cannot complain because a person, who has lawfully opened the hole and has also locked the door leading to it, has not put up a second less effectual barrier behind the door, unless that person has given him a right to expect it.

Suppose, however, that the jury had thought that, although the entrance door was shut, it was a reasonable further precaution for the defendants to shut the trap when their work was over, and had found that their work was over, and that they had delayed unreasonably in closing the trap, we think that, if the plaintiff was in a position to recover, the defendants might be liable on that ground. The extent of duty under such circumstances is a matter of expediency and degree, which different minds might fix at different points. But we think that it would not be unreasonable to require the defendants to put the plaintiff's floor back to the condition in which they found it, as they did put back the entrance door. The exceptions are not clear on this point, but there seems to have been some evidence which the jury were prevented from considering by the ruling of the judge. *Exceptions sustained.*